## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KENNETH BURDETTE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | |
| ) | **Case No. 10-1083-JAR** |
| **VIGINDUSTRIES, INC.,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

### MEMORANDUM AND ORDER

In 2004, Defendant Vigindustries, Inc. ("Vigindustries") acquired land in Hutchinson,

Kansas, upon which the Carey Salt Company solution mines operated from 1903 to 1999.

Before and after Vigindustries purchased this land, large sinkholes developed, and Vigindustries

took measures to prevent further sinkhole development.  The residents of Careyville, a

subdivision adjacent to the abandoned salt mines, seek class certification on their claims of

negligence and nuisance based on Vigindustries' activities on its land.  This matter is before the

Court on Plaintiffs' Motion for Class Certification (Doc. 56).  The Court conducted an

evidentiary hearing on January 27, 2012, and heard oral argument.  After considering the parties'

briefs, the evidence submitted with the briefs, and the evidence and argument presented at the

hearing, the Court is prepared to rule.  Unable to find that the evidence to support the Careyville

residents' common negligence and nuisance claims predominate over questions affecting only

class members, the Court denies Plaintiffs' motion for class certification.

I.      **Background**

Careyville is located in the southeastern portion of the City of Hutchinson, Kansas. The Careyville addition is a residential neighborhood consisting of residences that were built adjacent to the former Carey Salt Company solution mining plant. The houses in Careyville were primarily built during the 1930s, 1940s and 1950s as a "company town," providing housing for workers at the nearby plant.

The solution mining well field, located on the north and east perimeter of the residential neighborhood, includes 121 solution mining wells over approximately 200 acres.  The wells were drilled in the period from 1903 through 1998, and their depths range from approximately 600 feet to 755 feet below ground surface.  Many of the wells show a casing at the ground surface, but for many of the older wells, there is no surface expression. The solution mining operation shut down and discontinued in 1999.

Defendant acquired ownership of the land containing abandoned salt mines in 2004.  A large sinkhole developed in 2005.[1]  Earlier sinkholes had formed on the property now owned by Vigindustries in 1978 and 1990 but none reached the Careyville neighborhood.[2]  After the 2005 sinkhole developed, Vigindustries took efforts to stabilize the ground along the north side of the property, mitigating the concern that it might reach the BNSF rail line just north of the sinkhole. Vigindustries also retained an engineering and environmental consultant to formulate a plan to stabilize and backfill the cavern beneath the 2005 sinkhole, under the oversight of the Kansas

---

[1]Plaintiffs allege that the 2005 sinkhole developed in Careyville, Doc. 66 ¶ 19, but their expert and Defendant's evidence established that it formed on the north edge of the 200-acre parcel now owned by Vigindustries, which is on the opposite side of the property from Careyville.

[2]Mike West testified about another sinkhole that he recalls playing near as a boy, in the late 1950s or early 1960s.

Department of Health and Environment ("KDHE").

The KDHE required Defendant to conduct testing to determine the integrity of some of the salt mining wells.  Defendant retained an engineering firm, Burns & McDonnell, to study the wells and analyze the geological conditions that may cause sinkholes to form.  Burns & McDonnell advised that the shale bedrock roof of a cavern, located several hundred feet below ground, could collapse, causing the sand near the surface to begin to flow to fill the hole created by the collapse, thus forming a crater around the collapsed cavern at the surface.  Burns and McDonnell presented Vigindustries with two options.  First, Vigindustries could fill the caverns with sand, called backfilling.  Second, and alternatively, Vigindustries could create a safety buffer between the abandoned wells located on its property and the houses in Careyville.  Vigindustries selected the second approach, creating a buffer zone.

Defendant announced in August of 2009 that it planned to acquire and remove thirty-seven homes on the north and east perimeter of Careyville.  Defendant also indicated that once the homes were acquired and removed, it would construct a fence around the acquired property and maintain the property in a "park-like setting."  Vigindustries approached each of these thirty-seven homeowners, offering to buy their houses for fair market value, plus a premium, and thirty-six of these now have been purchased and removed.

Plaintiffs allege that, after acquiring ownership of the abandoned salt mines, Defendant failed to repair and/or maintain the salt mining wells and caverns, and thereby prevent land subsidence and sinkhole development.  As a result of Defendant's actions, Plaintiffs allege, the owners of the 271 residences that remain in Careyville have suffered permanent injury to their homes and property, diminution in the market value of their homes and property, loss of the full

use of their homes and property, deprivation of the peaceful use and enjoyment of their homes and property, inconvenience, discomfort, annoyance, and present and prospective injuries to their health, and other consequential, incidental and special damages.

Eleven lead Plaintiffs pursue claims for negligence and nuisance under Kansas law on behalf of themselves and other similarly situated homeowners.  Plaintiffs propose certification of a "class of all similarly situated residential property owners in Careyville as of August 2009," that includes the following two subclasses:

> Subclass A: All similarly situated owners of real property located in the Careyville neighborhood of Hutchinson, Reno County, Kansas, either adjacent to properties bought by Defendant VigIndustries Inc. or on the same block as said adjacent properties, whose real property has sustained economic damages due to subsidence issues emanating from Defendant's property; and

> Subclass B: All similarly situated owners of real property located in the Careyville neighborhood of Hutchinson, Reno County, Kansas, not adjacent to properties bought by Defendant VigIndustries Inc. and not on the same block as said adjacent properties, whose real property has sustained economic damages due to subsidence issues emanating from Defendant's property.

At the evidentiary hearing, Plaintiffs called two lead Plaintiffs from each subclass to testify.  Ken Burdette and Donna Schroeder testified from proposed subclass A and Glen (Mike) West and Danny Sidebottom testified on behalf of proposed subclass B.

Mr. Burdette has lived on the south side of Carey Boulevard for thirty-one years.  Carey Boulevard is the northernmost street in Careyville and is adjacent to Defendant's land.  Almost all of the homes on the northern side of that street were purchased and demolished by Defendant in its efforts to construct the buffer zone.  The BNSF railroad track runs just north of Carey Boulevard, and was previously hidden from view by those demolished homes.  Now, instead of

homes, Mr. Burdette's view from his front porch includes vacant lots, train cars, garbage, and a chain link fence. Mr. Burdette hears more noise from trains and the nearby grain elevator and more wind since the homes across the street were demolished. He also has experienced structural changes to his home, some of which began twenty-five years ago. Mr. Burdette has experienced shifting, walls cracking, a hole forming under the garage, and sidewalks that are cracking and tilting. Mr. Burdette fixed the cracks in the walls several times, but they reappear. The hole under Mr. Burdette's driveway is approximately four feet deep and four to five feet wide and he has been unable to park in his garage for ten or fifteen years. Burdette fears that he will never be able to sell his home because several homes in Careyville are on the market and do not appear to sell. Mr. Burdette also testified that the neighborhood is not as "neighborly" since the buffer zone was erected.

Mrs. Schroeder has lived on the west side of William Street for fifty-four years. William Street is the easternmost street in Careyville and borders Defendant's land. The Schroeders have maintained their home during this time and added onto the original structure. Mrs. Schroeder testified that they suffered no physical damage to their property until March 2011, when they discovered a crack in the garage floor. They are still able to park in the garage. Mrs. Schroeder testified that she is frightened of the unknown and that her view has changed since the homes and trees on the east side of the street were removed. Instead of homes, Mrs. Schroeder's view is of a vacant field. She has also experienced an increase in loud train noise. Mrs. Schroeder testified that the neighborhood looks strange now, as many of her neighbors are gone.

Danny Sidebottom lives on Liberty Street in Careyville, a few blocks away from the edge of the buffer zone. In 2007, his basement collapsed and he installed a new basement.

Mr. Sidebottom also has experienced cracking in the walls of his home from floor to ceiling.  He testified further that the view and feel of the neighborhood has changed when he drives into the neighborhood, citing the industrial-style fence and the lack of homes.  Mr. Sidebottom testified that the trains and elevator fans are louder since the buyout of homes in the buffer.  Mr. Sidebottom also complained that there are more renters in the neighborhood and that he believes the value of his property has declined.

Glen "Mike" West owns the residence where he was raised in the southeast corner of the neighborhood; his mother resides there and he maintains the property.  Mr. West testified that the "feel" of the neighborhood has changed; that he used to know every person in every house and now houses and trees have been removed and a fence has been erected.  Mr. West lamented the close of the neighborhood elementary school and grocery store.  He cited the increase in homes for sale and the increase in renters.  West testified about repeated problems with his house.  In 1986 or 1987, he replaced the basement because the walls were separating and cracking, causing water runoff; now the new basement walls and floors have cracked.  The windows and doors stick, despite replacing the windows.  He has repeatedly repaired the sewer pipe because the vent pipe bulges through the bathroom wall.  He built a deck on the front of the house over the sidewalk and porch because the porch sank and caused his elderly mother to trip and break her arm.  Mr. West's homeowners' insurance on the residence was cancelled shortly after Vigindustries announced the buyout of the buffer zone properties.

In addition to this testimony, Plaintiffs offered the expert deposition testimony and report of Dr. Robert A. Simons, who conducted a real estate analysis before opining about economic damages to the Careyville properties.  As part of this analysis, Dr. Simons considered sixty-four

6

surveys completed by the named Plaintiffs and some of the proposed class members in this case. This survey included responses to questions about interference with the use and enjoyment of property and any physical damages to each respondent's property.  After evaluating the surveys, other research in this case, and based on his background and knowledge of similar cases, Dr. Simons opined that

> the proposed class members in this case are commonly affected by the actual subsidence, potential subsidence, or proximity to bought-out residential property related to the Defendant's property. The class includes both those known to have subsidence-related physical damage, and those proximate and potentially affected at some future date.  All have suffered property damages resulting from salt mine subsidence issues.[3]

Dr. Simons calculated the economic losses of each subclass in his report.

## II.      Class Certification Under Rule 23

Fed. R. Civ. P. 23 governs class actions in federal court.  The court possesses significant latitude in deciding whether or not to certify a class.[4]  And whether a case should be allowed to proceed as a class action is an intensely fact-based question that is fraught with practical considerations.[5]   In deciding whether the proposed class meets the requirements of Rule 23, the Court may accept Plaintiffs' substantive allegations as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints."[6]  The Court must conduct a "rigorous

---

[3]Doc. 57, Attach. 1 at 3–4.

[4]*Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009) (citing *Shook v. Bd. of Cnty. Comm'rs,* 543 F.3d 597, 603 (10th Cir. 2008)).

[5]*See Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988).

[6]*See J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999) (citation omitted).

analysis" to ensure that Plaintiffs' putative class meets the requirements of Rule 23.[7]

"Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's

underlying claim.  That cannot be helped."[8]  The Court's analysis of the certification issue

"involves considerations that are enmeshed in the factual and legal issues comprising the

plaintiff's cause of action."[9]

As the party seeking class certification, Plaintiffs must show "under a strict burden of

proof" that their putative class meets the requirements of Rule 23.[10]  Plaintiffs must first satisfy

all four prerequisites of Rule 23(a) by showing that (1) the class is so numerous that joinder of

all members is impracticable, (2) questions of law or fact are common to the class, (3) Plaintiffs'

claims or defenses are typical of the claims or defenses of the class and (4) Plaintiffs will fairly

and adequately protect the interests of the class.[11]  These requirements are more commonly

known as numerosity, commonality, typicality, and adequacy of representation.  If the

requirements of Rule 23(a) are met, Plaintiffs must then show that their case fits within one of

the categories described in Rule 23(b).[12]  In this case, Plaintiffs seek to certify the class under

Rule 23(b)(3).

---

[7]*D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) (quotations and citations omitted).

[8]*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

[9]*Id*. (citations omitted).

[10]*Trevizo v. Adams,* 455 F.3d 1155, 1162 (10th Cir. 2006) (citing *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988)).

[11]Fed. R. Civ. P. 23(a).

[12]*See* Fed. R. Civ. P. 23(b).

A.      **Class Definition**

Defining the class is critical because it "identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action."[13]   The Court must ensure that the definition is "precise, objective, and presently actionable."[14]   Here, Plaintiffs seek to certify a "class of all similarly situated residential property owners in Careyville as of August 2009," as two subclasses, one that includes homeowners adjacent to or on the same block as the buyout properties, and one that includes all other homeowners.[15]

Defendant argues that Plaintiffs' class definitions are not based on objective criteria and that they require a determination on the merits in order to ascertain who belongs to each class. Specifically, Defendant objects to defining the class as "similarly situated" owners and by referring to the economic damages sustained by the real property.  Defendant is correct that these definitions explicitly require a determination about causation and injury in order to determine who belongs to the class, therefore, the definitions are not precise and objective.  The Court proceeds in its Rule 23 analysis with modified subclass definitions.  If the Court certified this class, it would remove the phrases "similarly situated" and "whose real property has sustained economic damages due to subsidence issues emanating from Defendant's property" from both subclass definitions.  Plaintiffs conceded during the oral argument that such a modification

---

[13]*Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 670 (D. Kan. 2008) (quoting Manual for Complex Litigation § 21.222, at 270 (4th ed. 2005)).

[14]*Id.*

[15]Under Rule 23(c)(5), "a class may be divided into subclasses that are each treated as a class under this rule."  "Each subclass must meet the prerequisites established by the rule."  *Monarch Asphalt Sales Co. v. Wilshire Oil Co. of Tex.*, 511 F.2d 1073, 1077 (10th Cir. 1975).

9

would be appropriate and would continue to accurately define the subclasses.[16]

**B.      Rule 23(b)(3) Requirements**

Plaintiffs ask to proceed as a class under Rule 23(b)(3) and the Court addresses this

requirement first.  A Rule 23(b)(3) class may be maintained if the prerequisites of Rule 23(a) are

met, and if:

> the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy. The
> matters pertinent to these findings include:
>> (A) the class members' interests in individually controlling
>> the prosecution or defense of separate actions;
>> (B) the extent and nature of any litigation concerning the
>> controversy already begun by or against class members;
>> (C) the desirability or undesirability of concentrating the
>> litigation of the claims in the particular forum; and
>> (D) the likely difficulties in managing a class action.

The predominance requirement "tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation."[17]  The requirement is met "if there is a common nucleus

of operative facts relevant to the dispute and those common questions represent a significant

aspect of the case which can be resolved for all members of the class in a single adjudication."[18]

"If the proposed class members will need to present evidence that varies from member to

member in order to make out a prima facie case, then it is an individual question.  If, on the other

hand, the same evidence will suffice for each member to make out a prima facie case, then it is a

---

[16]*See Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 671 (D. Kan. 2008); *Heartland Commc'n, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 115 (D. Kan. 1995) (explaining that Court can tailor class by modifying class definition).

[17]*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

[18]*Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 261 (D. Kan. 2010); *Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 670 (D. Kan. 2008).

common question."[19]  The parties dispute the degree to which the evidence will vary from member to member in this case for the remaining claims of nuisance and negligence.[20]

### 1.     Nuisance

In order to prove their nuisance claim under Kansas law, Plaintiffs will have to show that: (1) Defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.[21]  In order to "maintain an action for nuisance, a landowner must establish an interference with the owner's use and enjoyment of the property which is separate and distinct from the claim that the property's value has diminished because of marketplace fear or stigma."[22]

Defendant argues that the evidence needed to adjudicate the following issues on nuisance will vary between class members: (1) the type of interference with use and enjoyment of the subject property, if any; (2) whether the interference and the physical harm, if any, from that interference proved to be substantial and was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land; and (3) whether

---

[19]*Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678, 690 (D. Kan. 2009) (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005); *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).

[20]Plaintiffs' claims for strict liability, inverse condemnation, and trespass were previously dismissed.  *See* Docs. 17, 20, 100.

[21]*Pagel v. Burlington N. Sante Fe Ry. Co.*, 316 F. Supp. 2d 984, 989 (D. Kan. 2004).

[22]*Smith v. Kan. Gas Serv. Co.*, 169 P.3d 1052, 1062 (Kan. 2007).

there is interference that is separate from a diminution in property value due to marketplace fear or stigma.

Defendant points to the survey results and the lead Plaintiffs' testimony, which show disparate answers by the lead Plaintiffs and proposed class members about whether there was any interference with the use and enjoyment of their land, and if so, the type of interference experienced.  In response to Dr. Simons' survey, out of 63 respondents, 39 replied that "the potential subsidence issues (including proximity to buyout properties) from the abandoned salt mine changed how you use or enjoy your property," while 24 replied that potential subsidence issues did not change how they used or enjoyed their property.  Of the 39 respondents who experienced interference, the type of interference was placed in 9 categories, including "other."  Moreover, several lead Plaintiffs testified during their depositions that there had been no interference with their use and enjoyment of the property.

Plaintiffs insist that the Court should focus on Defendant's conduct and not the individual Plaintiffs' experiences.  Plaintiffs argue that each Careyville homeowner need not experience the same interference in order to prove a class wide prima facie case of nuisance.  Plaintiffs emphasize the common questions surrounding Defendant's actions and minimize the significance of any specific interference with the individual homeowners' use and enjoyment of their property.

The Kansas Supreme Court has discussed the relationship between nuisance and negligence as follows:

> Nuisance is a field of tort liability rather than a type of tortious conduct. Nuisance has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion. Professor Prosser

> concludes that the attempt frequently made to distinguish between nuisance and negligence, for example, is based entirely upon a mistaken emphasis based upon what the defendant has done rather than the result which has followed, and forgets completely the well-established fact that negligence is merely one type of conduct which may give rise to a nuisance. (Prosser, Law of Torts, 4th Ed., s 87, p. 573.) In other words a nuisance may result from conduct which is intentional or negligent or conduct which falls within the principle of strict liability without fault. The point is that nuisance is a result and negligence is a cause and they cannot be distinguished otherwise.[23]

Plaintiffs' attempt to focus solely on Defendant's conduct will be insufficient to prove a class wide claim of nuisance in this case because nuisance, by definition, requires a showing of the result of Defendant's conduct.

While it is not necessary that Plaintiffs prove a physical injury in order to sustain a nuisance claim, they must show an interference with the owners' use and enjoyment of the property.[24]  Plaintiffs cite several interferences as a basis for their classwide nuisance claim: subsidence and the increased risk of subsidence, inability to use basements, driveways, or garages, increased train noise, and decreased scenery or views.  Determining what constitutes a nuisance is a case-specific inquiry and depends on factors such as: "the type of neighborhood, the nature of the thing or wrong complained of, its proximity to those alleging injury or damage, its frequency or continuity, and the nature and extent of the injury, damage or annoyance resulting."[25]  Of these factors, only the type of neighborhood would lend itself to common evidence among these class members.

---

[23]*Culwell v. Abbott Constr. Co.*, 506 P.2d 1191, 1196 (Kan. 1973); *accord Smith*, 169 P.3d at 1060–61.

[24]*Smith*, 169 P.3d at 1061–62.

[25]*Sandifer Motors, Inc. v. City of Roeland Park*, 628 P.2d 239, 242 (Kan. Ct. App. 1981) (quoting *Vickridge Homeowners Ass'n, Inc. v. Catholic Diocese of Wichita*, 510 P.2d 1296 (1973)).

13

Both parties' evidence suggests that an analysis of the remaining factors would be different for each lead Plaintiff and putative class member. And contrary to Plaintiffs' argument, the individual Plaintiffs' testimony is integral to the analysis for purposes of applying these factors, which are based on the homeowners' use and enjoyment of their property. For example, the interference with Mr. Burdette's use and enjoyment includes increased noise and a view of train cars and garbage caused by the buyout of property across the street, as well as inability to park in his driveway and garage due to the hole that emerged more than ten years ago from alleged subsidence. This evidence differs from Mrs. Schroeder's interference, which involves an increase in noise, a view of an empty field, and a very recent crack in her garage floor that she has not had repaired. She testified that this crack has not prevented her from parking in her driveway or garage. Both of these Plaintiffs belong to subclass A, yet application of the relevant nuisance factors will require individualized inquiries. The frequency and continuity, as well as the nature and extent of these injuries significantly vary.

Because Plaintiffs claim stigma damages, they must also show interference that is different from the reduction in property value. The survey evidence and lead Plaintiff testimony establishes that individual evidence is needed in order to ascertain whether each class member could recover for stigma damages given this rule. Additionally, the survey results show that many of the proposed class members do not complain of any interference with the use and enjoyment of their land. And those who do claim to have suffered an interference differ in terms of the nature and wrong complained of, its frequency and continuity, the nature and extent of any injury and the damage and annoyance resulting.

One example is the difference in Mr. Sidebottom's and Mr. West's testimony with regard

to interference in subclass B.  They have each experienced structural damage to their properties, but at different time periods and in different terms of frequency, continuity, nature, and extent. Mr. Sidebottom's basement collapsed in 2007, while Mr. West's collapsed in 1986 or 1987. Even assuming that the type of interference was the same, one would potentially be subject to a statute of limitations defense, while the other would not.  Mr. West has experienced structural damage to his property going back to the 1980s and has repeatedly fixed problems with his sewer line.  The nuisance analysis for his property, therefore, differs, from Mr. Sidebottom's, which is tied to very recent structural damage that has not been continuous.  These differences require individual inquiries that would predominate and make a class action nuisance claim unmanageable.

Plaintiffs contend that subsidence and the risk of subsidence is itself a nuisance, as evidenced by the class wide diminution in property values, common evidence.  Plaintiffs cite two cases from other jurisdictions as persuasive authority that subsidence and risk of subsidence is a nuisance.  In *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, the Northern District of Oklahoma considered on summary judgment whether the Tribe could recover damages for subsidence or the risk of subsidence on their claim for public nuisance under Oklahoma law.[26]  The court found that there were genuine issues of material fact because the parties disputed

> the amount of land within the scope of the Tribe's claims that may be impacted by subsidence or the risk of subsidence and the severity of the alleged subsidence . . . .  If the Tribe's assessment of subsidence or the risk of subsidence is accurate, there may be a community-wide risk . . . that goes beyond the harm to the individual landowners.[27]

---

[26]653 F. Supp. 2d 1166, 1186–87 (N.D. Okla. 2009) (applying Okla. Stat. tit. 50 § 2).

[27]*Id.*

This case does not stand for the proposition that subsidence and risk of subsidence, as a matter of law, gives right to a private nuisance claim on a classwide basis.  The court held that there was a factual dispute about whether subsidence or the risk of subsidence amounted to community-wide harm.  Here, the various interferences claimed are not all tied to subsidence, but also to Defendant's creation of a buffer zone in order to prevent future subsidence and sinkhole development.  And here, the Court is focused on whether common evidence exists for the interferences experienced by the class members, not whether Plaintiffs can prove that subsidence caused an interference with certain Plaintiffs' use and enjoyment of the property.

Plaintiffs also cite *Freeman v. Blue Ridge Paper Products, Inc.*, where the Court of Appeals of Tennessee upheld a district court's decision to certify a class of property owners adjoining or abutting the Pigeon River in Cocke County, Tennessee, on a nuisance claim based on the defendant's discharge of certain compounds in the river.[28]  That court found a common interference among class members based on their right to the reasonable use of an adjoining watercourse and that their riparian rights were not dependent on the owners' actual use of the water.[29]  As already explained, however, there is no common interference claimed here.  Instead, the class will base their nuisance claim on various interferences, some that stem from subsidence, risk of future subsidence, and from the buyout of properties itself.  Such disparate interferences will require separate analyses of the relevant nuisance factors, different evidence,

---

[28]229 S.W.3d 694 (Tenn. Ct. App. 2007).

[29]*Id.* at 705–06.  Plaintiffs also rely on this case to suggest that where there is evidence that the defendant's actions affected the market value of the plaintiff's land, "there normally would be both substantial and unreasonable interference."  *Id.* at 706 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 88, at 627 (5th ed. 1984)).  But this rule does not displace the binding law of *Smith* that the interference must be different from the diminution in market value in order to claim stigma damages, as Plaintiffs claim here.  *See Smith v. Kan. Gas Serv. Co.*, 169 P.3d 1052, 1061–62 (Kan. 2007).

and possibly different defenses, which predominate over any common questions.

Plaintiffs will also have to show that the interference is unreasonable under Kansas law,

> Reasonableness is a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant. Determination of the gravity of the harm involves consideration of the extent and character of the harm to the plaintiff, the social value which the law attaches to the type of use which is invaded, the suitability of the locality for that use, the burden on plaintiff to minimize the harm, and other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of the purpose of the defendant's conduct, the social value which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence.[30]

The inquiry on this element of Plaintiffs' case will also require different evidence for each

homeowner.  Whether interference with gardening is unreasonable will require a separate

analysis from the reasonableness of interference from a collapsed basement.  The surveyed class

members in this case indicated over nine types of interference, which will require separate

determinations of reasonableness.

Plaintiffs urge that they only must prove that subsidence and risk of future subsidence is

unreasonable.  First, it is clear from the evidence and briefing that Plaintiffs claim interference

not only as a result of subsidence and risk of future subsidence, but also interference as a result

of Defendant's remediation effort in creating the buffer zone.  And the interference associated

with the buffer zone differs for various Plaintiffs.  Plaintiffs suggested at the evidentiary hearing

that the buffer zone was not large enough and perhaps should have encompassed the subclass A

---

[30]*St. David's Episcopal Church v. Westboro Baptist Church, Inc.*, 921 P.2d 821, 828 (Kan. Ct. App. 1996) (quoting *Kaplan v. Profile Action League of Greensboro*, 431 S.E.2d 282 (N.C. 1994)).

properties. On the other hand, some of Plaintiffs' claims appear to be tied to the negative effects of creating the buffer zone—the increase in noise, the unpleasant views from certain homes and for residents when they enter the neighborhood.  These claims will require different evidence to establish the class members' prima facie case.  And these various claims of interference will also differ in terms of the defenses offered—some may prompt a statute of limitations defense, while others will be defended under the various factors that apply to nuisance claims.  For all of these reasons, the Court finds that the common questions surrounding Plaintiffs' prima facie nuisance case would not predominate over the individual issues presented by the potential class members and that the class action is not a superior method for adjudicating this claim.

## 2.      Negligence

To prove their negligence claim, the class would be required to establish the existence of a duty, breach of that duty, injury, and a causal connection between the breach and the injury.[31] To recover for "diminution in value of real property resulting from the marketplace fear or stigma alleged to have been created by a defendant's negligence, the plaintiff must establish that the property sustained a physical injury as a direct and proximate result of the negligent conduct."[32]

Defendant argues that evidence to support the following issues vary between class members: (1) whether there is a physical injury to the land; and (2) whether Vigindustries' negligence caused the physical injury, or any other injury.  Plaintiffs maintain that the negligence claim arises out of the Defendant's actions, which would be based on the same evidence for all

---

[31]*Thomas v. Cnty. Comm'rs of Shawnee Cnty.*, 262 P.3d 336, 346 (Kan. 2011).

[32]*Smith*, 169 P.3d 1052, 1062–63.

class members, most likely through expert testimony.  Plaintiffs also disclaim Defendant's

reliance on the lead Plaintiffs' testimony because they are not necessarily qualified to testify

about whether their property sustained a physical injury.  Instead, Plaintiffs ask the Court to

defer to experts on this issue.  It appears that the parties can agree that the Plaintiffs' deposition

testimony does not provide the Court with evidence of a class wide physical injury.  The

question then is whether Plaintiffs will be able to muster some other form of common proof that

the homeowners' suffered a physical injury due to Defendant's breach.

Dr. Simons opines in his report that the class "includes both those known to have

subsidence-related physical damage, and those proximate and potentially affected at some future

date."[33]  Dr. Simons is not a geologist, nor does he submit an opinion on the scope of subsidence

in this case.  He is a damages expert who was retained to conduct a real estate analysis to

calculate economic damages from the diminution in the Careyville homeowners' property values

since the buyout.  In fact, his opinion is based in part on the requirements under Kansas law that

homeowners disclose to potential buyers and lenders the subsidence conditions "in the area as

potentially affecting the value, beneficial use, or desirability" of their property.  According to Dr.

Simons, this disclosure requirement causes the diminution in property value "even if those

owners' property itself had not yet shown evidence of subsidence-related physical damage."

His opinion, as well as Plaintiffs' reliance on the risk of future subsidence as an injury, reveals

that there is no claim in this case that all Careyville homeowners have sustained physical damage

from subsidence.  Instead, while some of the lead Plaintiffs and proposed class members have

certainly suffered some physical damage to their land, the rest contend only that their property is

---

[33]Doc. 57 at 3.

at risk of future subsidence and that this risk alone causes a diminution in property value.  Such damages are unquestionably stigma damages, defined by the Kansas Supreme Court as "diminution in value of real property resulting from the marketplace fear or stigma alleged to have been created by a defendant's negligence."[34]  Plaintiffs dispute Defendant's characterization of their case as "mainly about stigma damages," but their expert report clearly and unmistakably relies on stigma damages in calculating the diminution in property value for the Careyville homeowners.  Accordingly, Plaintiffs will be required to show classwide physical injury in order to sustain their negligence claim in this case.

Plaintiffs seem to argue that the reduction in market value is instead "the market reaction to a property with a documented history of subsidence, not a true 'stigma claim.'"[35]  The problem with this argument is that the evidence presented on class certification suggests that this is a hybrid case: some properties allegedly suffered a decline in property value based on an actual history of subsidence, while others allegedly suffered from market fear based on their proximity to the abandoned salt mines and to neighboring properties that have experienced actual subsidence.  Dr. Simons confirms this conclusion, as he admits that the decline in property values for this latter group would be due to potential disclosure requirements, "even if those owners' property itself had not yet shown evidence of subsidence-related physical damage."  Moreover, despite Plaintiffs' assertion that expert testimony will reveal a class wide physical injury, they offered no evidence to support that assertion.  To the contrary, the survey results, representing less than half of all Careyville residents, show that twenty-five respondents did not

---

[34]*Smith*, 169 P.3d at 1062–63.

[35]*Hancock v. Island Creek Coal Co.*, No. 06CV-52-M, 2009 WL 973371, at *6 (W.D. Ky. Apr. 10, 2009).

believe their properties had been damaged by subsidence and sixteen did not believe that their properties had experienced any subsidence issues.

The Kansas Supreme Court was unequivocal in *Smith* when it stated that, to recover stigma damages under a negligence theory, the plaintiff must show physical injury as a direct and proximate result of the Defendant's conduct.[36]  There is no evidence in the class certification record that suggests Plaintiffs can show classwide physical injury through common evidence, which is necessary to recover the claimed economic damages in this case.  Because this issue will be dispositive on Plaintiffs' negligence claim, the Court is unable to find that common questions predominate.

Plaintiffs suggest that *Smith* does not apply here because that case involved a harm that was remediated.  *Smith* was a class action against the operator of a gas storage facility in Hutchinson, Kansas, seeking damages for nuisance and negligence after natural gas escaped from the facility, migrated underground, and rose to the surface through abandoned wells that had not been properly plugged.  Kansas Gas Service took remedial action by deep drilling vent wells in the area to allow the gas to escape.  None of the property owners experienced damage from the gas explosions, but sought damages for "diminished property values as a result of release and/or threatened release of natural gas from the Yaggy facility."[37]  While it is true that the gas release was remediated in *Smith*, Plaintiffs fail to explain how this fact alters the rule of law announced in that case—that a physical injury is required where the plaintiff seeks to recover stigma damages.  Like *Smith*, there will be an issue in this case about whether Plaintiffs

---

[36]*Smith*, 169 P.3d at 1063.

[37]*Id.* at 1054.

have established a physical injury.[38]  Because this inquiry will be individualized, the Court

cannot find that common questions will predominate.

In sum, the Court finds that class certification is not appropriate in this case because

Plaintiffs have failed to show that the requirements of Rule 23(b)(3) are met for each subclass on

the remaining claims for nuisance and negligence.

### C.      Rule 23(a) Requirements

In the alternative, the Court finds that Plaintiffs are unable to meet all of the prerequisites

of Rule 23(a).

### 1.      Numerosity

To meet their burden with respect to the numerosity element, Plaintiffs must establish

"that the class is so numerous as to make joinder impracticable."[39]  Contrary to Plaintiffs'

assertion, there is "no set formula to determine if the class is so numerous that it should be so

certified."[40]  Because it is such a fact-specific inquiry, the district court is granted wide latitude

in making this determination.[41]

Subclass A is comprised of 54 members and subclass B is comprised of 217 members.

The Court easily finds that subclass B is so numerous as to make joinder impracticable.

Defendant argues that subclass A is not necessarily so large as to make joinder impracticable, as

---

[38]It appears that this case does involve a harm that was remediated, as Plaintiffs acknowledge in their list of common questions set forth in the certification motion.  Doc. 57 at 9.  In fact, a key issue presented at the evidentiary hearing was whether Defendant's attempts to remediate sinkhole development through the buyout of homes in the buffer zone were appropriate under the circumstances.

[39]*Trevizo v. Adams,* 455 F.3d 1155, 1162 (10th Cir. 2006) (citation omitted).

[40]*Id.* (citing *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 436 (10th Cir. 1978)).

[41]*Id.* (citation omitted).

it contains just 54 property owners within a confined area, making it easy to locate any

remaining individuals for joinder if they wish to sue.  Similar to *Trevizo*, where the Tenth Circuit

affirmed a district court finding that 84 members was not sufficiently numerous,[42] this case

involves an amount of putative class members that is not "overwhelmingly large" so as to be

prohibitive of joinder.  There would be no problem identifying the remaining individuals in this

subclass for joinder because they all own property in a defined area.  Accordingly, subclass A

does not meet the numerosity requirement.

### 2.    Commonality

Plaintiffs must also show questions of law or fact common to the class.  A single

common question will suffice.[43]  However, the phrasing of Plaintiffs' question is not dispositive.

In *Wal-Mart v. Dukes*, the Supreme Court  noted that the language in the commonality

requirement of Rule 23(a)(2) is easy to misread because "[a]ny competently crafted class

complaint literally raises common 'questions.'"[44]  Plaintiffs' claims must depend upon a

common contention "of such a nature that it is capable of classwide resolution—which means

that determination of its truth or falsity will resolve an issue that is central to the validity of each

one of the claims in one stroke."[45]  Therefore, it is not the raising of common "questions" that

matters, but rather "the capacity of a classwide proceeding to generate common *answers* apt to

drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the

---

[42]*Id.*

[43]*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).

[44]*Id.* at 2551.

[45]*Id.* at 2551–52.

potential to impede the generation of common answers."[46]  Defendant concedes that Plaintiffs can show a single common question of law or fact in this case.

### 3.        Typicality and Adequacy

The parties discuss typicality and adequacy together.  To show typicality under Rule 23(a)(3), Plaintiffs must prove that their claims are typical of those of the putative class. Therefore the class representative must "be a member of the proposed class, have interests coextensive with and not antagonistic to the interests of the class, and have suffered the same injury as the class members."[47]  The class representatives' claims may differ factually so long as they arise from the same events or course of conduct and are based on the same legal or remedial theory.[48]  "The typicality requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large."[49]

"The typicality requirement dovetails with the Rule 23(a)(4) adequacy of representation requirement . . . [and] . . . [a]typical claims potentially create antagonistic interests."[50]  The Rule 23(a)(4) adequacy of representation requirement involves two issues: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will

---

[46]*Id.* at 2551 (quotation and citation omitted) (emphasis in original).

[47]*Commander Props. Corp. v. Beech Aircraft Corp.,* 164 F.R.D. 529, 535 (D. Kan. 1995) (citations omitted); *see also Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 622 (D. Kan. 2008).

[48]*Thompson*, 250 F.R.D. at 622.

[49]*Id.*

[50]*Commander Props. Corp.*, 164 F.R.D. at 536.

the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[51]
Defendant does not challenge the adequacy of Plaintiffs' counsel to serve as class action counsel,
but argues that Plaintiffs would not be adequate class representatives.

A class representative is adequate as long as the class representative does not have a
conflict which goes to the heart of the claims made by the class.[52]  The existence of minor
conflicts alone will not defeat a party's claim to class certification; the conflict must be a
"fundamental" one going to the specific issues in controversy.[53]  A fundamental conflict exists
where some party members claim to have been harmed by the same conduct that benefitted other
class members.[54]  "In such a situation, the named representatives cannot 'vigorously prosecute
the interests of the class through qualified counsel' because their interests are actually or
potentially antagonistic to, or in conflict with, the interests and objectives of other class
members."[55]

To show typicality, Plaintiffs argue: (1) the claims of all class members arise from the
same conduct by Defendant and the same theories of liability; (2) the evidence will be the same
for all class members; (3) subclass A Plaintiffs are all residential property owners in Careyville
who live on the same block or adjacent to homes that were demolished by Defendant and

---

[51]*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002), *cert. denied sub nom. Brelsford v. Rutter & Wilbanks Corp*, 539 U.S. 915 (2003) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998)).

[52]*Sosna v. Iowa*, 419 U.S. 393, 403 (1975).

[53]*Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citations omitted).

[54]*Id.*

[55]*Id.* (citations omitted).

suffered a 55% loss in property value; (4) subclass B Plaintiffs are all residential property owners in Careyville who do not live on the same block or adjacent to demolished homes, suffering a 50% loss in property value; and (5) evidence of causation will be the same for all class members.  On the issue of adequacy, Plaintiffs argue that all class members will prove the same issues for liability and that the lead Plaintiffs will vigorously prosecute the class claims.

  For many of the same reasons discussed in the Rule 23(b)(3) discussion, the Court does not find that Plaintiff can show typicality and adequacy of representation.  First, the fact that the class members all purport to allege claims of negligence and nuisance is insufficient to show typicality.  And the fact that the subclasses all have calculable damages does not establish typicality, especially given the lack of evidence that all class members can recover economic damages in this case.

  On the nuisance claim, the class members' evidence of interference varies among the lead Plaintiffs within each subclass and as between the lead Plaintiffs and the purported class members, based on the survey results and the lead Plaintiffs' testimony.  On the negligence claim, the class will be required to show physical injury to recover stigma damages and Plaintiffs did not meet their burden of proving that the lead Plaintiffs have suffered the same injury as the class.  Because the Plaintiffs have either not suffered the same injury as the class members, or their claims are not based on the same legal theory of relief, they have not met their burden of establishing typicality.

  Moreover, given the difference in proof of injury, the Court cannot conclude that these Plaintiffs would adequately represent the interests of the class. Those class members who have suffered no physical injury have claims that are potentially antagonistic to those who have

26

suffered a physical injury to their land.  Similarly, those Plaintiffs who have suffered no interference other than the reduction in their property's market value are not typical of those class members who have suffered some other interference, as required by *Smith*.

Because Plaintiffs do not meet their burden of showing that the prerequisites of Rule 23(a) have been met in this case, the Court would alternatively deny the certification motion on this basis.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Class Certification (Doc. 56) is **denied**.

Dated: <u>February 8, 2012</u>

 S/ Julie A. Robinson 
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

27