## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KENNETH BURDETTE, et al.,    )
    )
      **Plaintiffs,**    )
    )
**vs.**    )
    )    **Case No. 10-1083-JAR**
**VIGINDUSTRIES INC.,**    )
    )
      **Defendant.**    )
_____)

## MEMORANDUM AND ORDER

In 2002, Defendant Vigindustries, Inc. ("Vigindustries") acquired land in Hutchinson, Kansas, upon which the Carey Salt Company solution mines operated from 1903 to 1998. Before and after Vigindustries purchased this land, large sinkholes developed, and Vigindustries took measures to prevent further sinkhole development. Plaintiffs are residents of Careyville, a subdivision adjacent to the abandoned salt mines, who brought this action claiming negligence and nuisance based on Vigindustries' activities. Before the Court are Defendant's Motion for Summary Judgment (Doc. 187), and Motion to Exclude Expert Opinions of Dr. David L. Mitchell (Doc. 185). For the reasons explained in detail below, the Court grants both motions.

## I.    Uncontroverted Facts and Summary of Plaintiffs' Claims

The following facts are either uncontroverted or stipulated. The Careyville neighborhood is located in the southeastern portion of the City of Hutchinson, Kansas. Careyville once consisted of approximately 300 residences built on land adjacent to the wellfield where the former Carey Salt Company's solution mining operation was located. Solution mining operations were conducted on the wellfield adjacent to Careyville (and now owned by defendant Vigindustries) from 1903 to 1998, with about 106 brine wells distributed across the roughly 200

acres comprising the wellfield. No solution mining operations have occurred on the wellfield since 1998. Defendant Vigindustries acquired the land comprising the wellfield in 2002. Vigindustries never drilled or operated any brine wells on the wellfield or in the Careyville area.

In January 2005, the underground cavern resulting from one of the brine wells collapsed, creating a sinkhole near the northern edge of the wellfield. At the direction of the Kansas Department of Health and Environment ("KDHE"), Vigindustries investigated the brine wells and caverns on the wellfield. As a result of Vigindustries' investigation, and in agreement with the KDHE and the City of Hutchinson, Vigindustries announced in August 2009 that it would make offers to buy certain residential properties located on the northern and eastern edges of the Careyville neighborhood in order to increase the buffer between the former brine wells on the wellfield and the residential properties in Careyville.

To determine which homes should be included in the buyout, Vigindustries' geologists and geotechnical engineers at Burns & McDonnell reviewed all documented sinkholes related to salt solution mining in Kansas. Burns & McDonnell determined that the largest documented sinkhole related to salt solution mining in Kansas occurred at the Cargill plant in Hutchinson in 1974. The Cargill sinkhole had a radius of 180 feet. Burns & McDonnell proposed and Vigindustries adopted this maximum-observed radius of 180 feet to determine the scope of the buyout in Careyville. Essentially, Burns & McDonnell drew a circle with a radius of 180 feet around each well along the edges of the neighborhood, resulting in a line through the neighborhood. Those homes which were inside that line were included in the buyout. The purpose of Vigindustries' buyout was to buy those homes and move those residents who were at risk of a future sinkhole because of proximity to the solution wells on the wellfield.

Vigindustries announced that it planned to remove the homes on the property it purchased in Careyville and to maintain the property as an undeveloped buffer between the residential property in Careyville and the former brine wells on the wellfield. Vigindustries' agreement with the KDHE and the City of Hutchinson provided, among other things, that if any of the homeowners to whom Vigindustries planned to make offers declined to sell their property to Vigindustries, the City of Hutchinson would initiate condemnation proceedings under its power of eminent domain to acquire the property. Vigindustries made offers to purchase thirty-seven properties in Careyville. All but one of the homeowners who received offers from Vigindustries sold their property to Vigindustries. One owner, Bill Stull, rejected Vigindustries' offer. Pursuant to the agreement between Vigindustries, the KDHE, and the City of Hutchinson, the City acquired Mr. Stull's property through a condemnation proceeding in state court. The homes purchased by Vigindustries on the perimeter of the Careyville neighborhood were removed from the property and a decorative fence was erected between the property acquired by Vigindustries and Careyville. By April 2, 2010, with the exception of the property owned by Mr. Stull, the acquisition of the property for the buffer was complete. By May 2010, all of the homes purchased by Vigindustries, with the exception of the homes owned by Mr. Stull and by Milda Friesen, had been removed. The Careyville properties purchased by Vigindustries were on William Street and Carey Boulevard.

Plaintiffs Kenneth and Linda Burdette, Donna Schroeder, Robert and Tresia England, Danny and Sharon Sidebottom, Glen West, James West, and Stephanie Brown all own residential property in Careyville that was not purchased by Vigindustries in the buyout.[1]

_____

[1]Plaintiff Lloyd Schroeder is no longer living.

Plaintiffs Kenneth and Linda Burdette claim that, among other things, their home has sustained cracks in the ceiling, walls, garage floor and driveway, that their roof sags, and that they have an unexplained hole under their driveway. The Burdettes first noticed the cracks in their ceiling, walls, driveway and garage floor, the hole under their driveway and the sagging roof more than ten years before their depositions were taken in November 2010. Mr. Burdette has known that the field east of Careyville was used for salt solution mining since he moved to Careyville in approximately 1980; he suspects that the hole under his driveway was caused by actions connected with the salt mining on the wellfield. Knowing about the 2005 sinkhole on the wellfield, in combination with Vigindustries' buyout, caused Mrs. Burdette concern that her home might be in danger. She read of the latest sinkhole in the newspaper when it occurred.

Plaintiff Stephanie Brown claims, among other things, that her home has cracks in its foundation and back porch walls, that her basement floor and backyard slope, and that the end of her driveway has sunk. Ms. Brown first noticed this damage to and around her home five years or more before her deposition was taken in November 2010. Ms. Brown has known there were brine wells on the field east of Careyville since her father purchased her house in Careyville in approximately 1989. Ms. Brown believes that the cracks in her foundation were caused by the ground shifting associated with the salt wells. One reason she associates the cracks with the salt wells is the existence of sinkholes on the wellfield, including the 2005 sinkhole. Ms. Brown heard of the 2005 sinkhole on the day it happened.

Plaintiffs Danny and Sharon Sidebottom claim that their home had cracks in the walls and that their backyard was uneven and had sinking spots and unexplained holes. The Sidebottoms first noticed the cracks and changes in their yard in approximately 1994. In

early 2007, the Sidebottoms noticed that their house had shifted on its foundation. Shortly after that, in May 2007, their basement wall collapsed. Mrs. Sidebottom suspects the damage to her house was caused by the salt wells. The Sidebottoms learned of the solution wells on the wellfield right after the 2005 sinkhole occurred.

Plaintiffs James and Glen West have known of subsidence in the yard of their property in Careyville since the mid-1960s. The Wests' foundation and basement collapsed in approximately 1986. The Wests also claim that their windows and doors were hard to open and shut, that their patio and sidewalk had sunk and were broken, and that their driveway was tilted and broken. The Wests first noticed these problems with their windows and doors, patio, sidewalk, and driveway more than five years before their depositions were taken in November 2010. Glen West believes that much of the structural damage to the Wests' house was related to the type of mining done on the wellfield, although he does not know for sure. James West believes that the basement on their house collapsed because of subsidence caused by the salt mining around Careyville. James and Glen West have been aware that the field east and north of Careyville was used for salt solution mining for decades. Glen West has known of sinkholes in the field east of Careyville since he was a child growing up in Careyville. James West first learned of the most recent sinkhole in 2005. He was aware of other sinkholes on the wellfield during his childhood. James West was born in 1945.

Plaintiffs filed this action on January 6, 2010, alleging several claims associated with their allegation that Vigindustries and its predecessors in interest failed to use reasonable care in the operation and maintenance of the Careyville salt mines and that they failed to use reasonable care in developing the buffer zone. Plaintiffs' remaining claims in this case are for negligence

and nuisance.

Plaintiffs assert that Defendant was negligent in five ways: (1) failing to properly support the land adjacent to the salt mine; (2) failing to properly maintain the abandoned salt mine; (3) failing to timely detect, prevent, stop or remedy land subsidence and sinkhole development; (4) creating and maintaining a dangerous condition; and (5) failing to create a reasonable buffer zone and identify and purchase all homes at risk of future subsidence.

Plaintiffs allege nuisance in four ways: (1) the ground movement, subsidence and sinkholes, along with the resulting damage to Plaintiffs' homes; (2) the risk of future subsidence to Plaintiffs' homes; (3) Defendant's failure to create a reasonable buffer zone and identify and purchase all homes at risk of future subsidence including Plaintiffs' has created a nuisance and interfered with the Plaintiffs' use and enjoyment of their properties; and (4) Defendant's demolition and removal of homes on the north and east perimeter of the Careyville neighborhood and the resulting increase in train and elevator noise, increase in rodent and wildlife infestation, and decrease in the aesthetics of the neighborhood.

Plaintiffs claim the following damages were caused by Defendant's actions: physical damage to Plaintiffs' homes and property; a decrease in the market value of Plaintiffs' homes and property as a result of both the physical damage and the stigma now associated with the homes; loss of the full use of their homes and property; deprivation of the peaceful use and enjoyment of their homes and property; and inconvenience, discomfort, and annoyance.

II.     **Motion to Exclude**

Plaintiffs disclosed two experts for this case: Robert A. Simons to testify about

the diminution in Plaintiffs' property values as a result of the buyout, and David L. Mitchell on geological issues surrounding the wellfield. Dr. Mitchell, a consulting forensic geoscientist, opines that over-drilling and the uncertain geology of the salt member below the Carey Wellfield, create a risk of land subsidence and risk of future subsidence for all property owners in Careyville. Dr. Mitchell further opines that there is no scientific method available to identify and insure a permanent "safe zone" within the wellfield, or any part of Careyville. Defendant moves the Court to exclude this testimony because: (1) Dr. Mitchell is not qualified to render these opinions; (2) it is not reliable; and (3) it is not relevant. As explained below, the Court excludes this testimony.

### A.      Standard

The Court has broad discretion in deciding whether to admit expert testimony.[2] Fed. R. Evid. 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[3]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or

---

[2]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[3]Fed. R. Evid. 702.

unaccepted speculation."[4]  In order to determine whether an expert opinion is admissible, the

Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's

proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[5]

Second, the district court must further inquire into whether the proposed testimony is sufficiently

"relevant to the task at hand."[6]  An expert opinion "must be based on facts which enable [him] to

express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute

certainty is not required."[7]  And it is not necessary to prove that the expert is "indisputably

correct," but only that the "method employed by the expert in reaching the conclusion is

scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability

requirements."[8]

     *Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider

when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been

tested; (2) whether it has been subjected to peer review and publication; (3) the known or

potential rate of error; and (4) general acceptance in the scientific community.[9]  But "the

gatekeeping inquiry must be tied to the facts of a particular case."[10]

     It is within the discretion of the trial court to determine how to perform its gatekeeping

---

[4]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[5]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[6]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[7]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[8]*Id.*

[9]*Daubert*, 509 U.S. at 593–94.

[10]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted).

function under *Daubert*.[11]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[12]  In this case, the parties do not request a hearing.  The Court has carefully reviewed the exhibits filed with the motions and believes this review is sufficient to render a decision.

### B.    Discussion

Defendant first argues that Dr. Mitchell is not qualified to render an opinion about the cause of Plaintiffs' property damage, the risk of future subsidence, and the creation of a buffer zone.  While Defendant concedes that Dr. Mitchell is a qualified meteorologist, it questions whether his education and experience qualify him to render an opinion on geology and salt mining operations or on drawing the line for buffer zones.

To qualify as an expert, Dr. Mitchell must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."[13]  A witness's lack of specialization does not affect the admissibility of the opinion, only the weight.[14]

The record supports Defendant's contentions that Dr. Mitchell (1) admits that he is not a geologist and that he is not an expert in salt mining or any kind of mining; (2) has no experience in salt mining, or any mining industry; (3) has not published in any professional journal about geology, salt mining or mining standards according to his CV; (4) testified that he thinks there

---

[11]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[12]*Id.*

[13]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quotation omitted).

[14]*First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000) (citing *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

must be standards governing how solution mining is done, but he is not familiar with any such regulations; (5) has never been retained in any other case involving salt mining or cavern collapse; and (6) admits he is not an expert in drawing the line for a buffer zone such as this one.

Plaintiffs and Dr. Mitchell point to his training at various oil and gas companies in geophysics and modeling. But this case does not involve oil and gas issues. And although Dr. Mitchell says he is an expert in a number of different kinds of modeling— air modeling, groundwater pollution modeling, geophysical modeling and geological modeling—he did no modeling for this case. Plaintiffs also point to Dr. Mitchell's oil and gas exploration in and around salt domes. When asked whether he had any experience in connection with salt formation, Dr. Mitchell replied "No. . . .  only in the exploration role," referring to his work with salt domes and imaging salt in the Gulf of Mexico for oil companies. Dr. Mitchell admitted that although this exploration involved "the same salt," it involves very different amounts of pressure. There is no evidence in the record that Dr. Mitchell's work in the oil and gas field translates into expertise on the subject of salt mining and its impact on surrounding land.

Finally, Plaintiffs argue that Dr. Mitchell has provided expert opinions in over 200 cases, including one case "similar to Plaintiffs' here addressing whether environmental and structural damage was caused by movement of the Earth through seismic vibrations." But as Dr. Mitchell testified, the seismic damage cases he has worked on involve fracking and blasting. Neither Dr. Mitchell nor Plaintiffs explain how the same principles apply to his analysis in this salt mining case. In sum, the Court does not find support in the record that Dr. Mitchell is qualified to testify as an expert on the subjects of causation or standard of care in this case.

Moreover, the Court finds Dr. Mitchell's opinions unreliable. First, Dr. Mitchell's

opinions on subsidence do not appear to be based on scientific methodology, but are instead, based on assumptions and speculation. While there is no requirement that an expert's methods be perfect, whether the conclusions are reliable should be based on more than the *ipse dixit* of the expert.[15] Dr. Mitchell claims that the structural damage to Plaintiffs' properties must have been caused by the salt mines because "there's no other cause," yet, he admits that there are other potential causes for the kinds of damages seen in Plaintiffs' homes, such as soil composition. Dr. Mitchell also opined about the density of the wells—that it was too high—based solely on the fact that sinkholes have developed. But this opinion is circular. Dr. Mitchell was asked for an opinion on the cause of Plaintiffs' damage and his opinion suggests that the damage in and of itself is evidence of causation. Dr. Mitchell points to no objective test or examination to support his conclusion other than the assumption that the sinkholes must have caused the damage to Defendants' property. This is an insufficient showing of reliability under Rule 702 and asks the Court to find his testimony admissible based on the *ipse dixit* of the expert.

Defendant challenges Dr. Mitchell's basis for opining that the buffer zone created by Defendant is insufficient because he admitted it was not based on any scientific data. Instead, Dr. Mitchell relied on the fact that the neighborhood is adjacent to the wellfield, that people in Careyville have experienced structural damage to their properties, and that Plaintiffs in this case all own property within Careyville. Plaintiffs counter that this argument goes to the weight and not the admissibility of the expert testimony, but they provide no counter argument about the reliability of Dr. Mitchell's opinions.

The Court agrees that Plaintiffs have failed to show that Dr. Mitchell's opinions are

---

[15]*Windham v. Circuit City Stores, Inc.*, 420 F. Supp. 2d 1206, 1211 (D. Kan. 2006).

based on methods that are scientifically sound, or that they are based on facts which satisfy Rule 702's reliability requirements. Defendant retained geologists and geotechnical engineers to help it determine where to mark the buffer zone, and therefore, which houses to buy. These experts determined, after an extensive review of documented sinkholes in Kansas, that 180 feet, the maximum observed radius, was the appropriate radius to use from each well along the edges of the Careyville neighborhood. Dr. Mitchell admitted in his deposition that the buffer zone should be measured by creating a perimeter a certain distance out from the wells, yet he cannot say what the appropriate distance should be. His testimony on this point varied—referencing hundreds of feet, between one and five blocks, and a quarter of a mile to a mile from the wells. Notwithstanding this testimony, Dr. Mitchell concludes that Defendant should have purchased all homes in the Careyville neighborhood, claiming that Defendant had a duty to take care of people in the adjacent neighborhood. This opinion is based on assumptions and is not rooted in scientific methodology or principle. Accordingly, Dr. Mitchell's expert opinion regarding the buffer zone is not reliable under *Daubert* and should be excluded.

## III.    Motion for Summary Judgment

### A.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[16] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[17] "There is no genuine issue of material fact

---

[16]Fed. R. Civ. P. 56(a).

[17]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[18] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[19] An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[20]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[21] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[22]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[23] The nonmoving party may not simply rest upon her pleadings to satisfy her burden.[24] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from

---

[18]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[19]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[20]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[21]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[22]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[23]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[24]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

which a rational trier of fact could find for the nonmovant."[25] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[26]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[27]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[28]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[29]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[30]

## B.    Timeliness

The Court first considers Defendant's argument that many of the claims asserted by Plaintiffs are barred by either the statute of repose or the statute of limitations.  The parties have already stipulated that Plaintiffs' negligence and nuisance claims based on activity occurring

---

[25]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[26]*Adams*, 233 F.3d at 1246.

[27]Fed. R. Civ. P. 56(c)(4).

[28]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[29]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[30]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

before January 6, 2000, i.e., more than ten years before this action was filed, shall be dismissed.[31]

Plaintiffs argue that because their remaining claims allege land subsidence, their claims survive the statute of repose under *Nida v. American Rock Crusher Co.*,[32] a case that considered the accrual date for the statute of repose in the context of trespass claims for land subsidence.[33]  This Court considered *Nida* in its earlier opinion granting Defendant's motion for partial summary judgment on Plaintiffs' trespass claims.[34]  The Kansas Supreme Court in *Nida* explained that an action for surface collapse due to inadequate subjacent support, which sounds in trespass, begins to run at the time the surface collapses.[35]  The court compared this accrual analysis to a claim for negligence, which runs from "the wrongful act of the defendant.  Once it takes place the negligence has occurred, even though the harmful consequence may not be manifest until later."[36]  There is no trespass claim remaining in this action, so the portion of *Nida* relied upon by Plaintiffs does not apply.  In the Pretrial Order, Plaintiffs allege that the measures taken by Defendant to contain subsidence caused by earlier mining activities, and its alleged failure to create a reasonable buffer zone give rise to the remaining causes of action for negligence and nuisance.  Any such actions that precede January 6, 2000 are barred by the statute of repose.

---

[31]Doc. 17.  K.S.A. § 60-513(b) provides that "in no event shall an action [subject to the two-year statute of limitation] be commenced more than 10 years beyond the time of the act giving rise to the cause of action."  This ten year statute of repose "require[s] a negligence action to be brought within 10 years of the wrongful act."  *Klose v. Wood Valley Racquet Club, Inc.*, 975 P.2d 1218, 1222 (Kan. 1999) (citing *Dobson v. Larkin Homes, Inc.*, 832 P.2d 345, 347 (Kan. 1992)).

[32]855 P.2d 81 (Kan. 1993).

[33]*Id.* at 82.

[34]Doc. 100.

[35]*Nida*, 855 P.2d at 86.

[36]*Id.*

Defendant argues that several of Plaintiffs' claims are also barred by the statute of limitations because they were reasonably ascertainable more than two years before the case was filed. The statute of limitations on Plaintiffs' remaining claims is two years.[37] These tort claims

> shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.[38]

Plaintiffs make the same argument about the accrual date on the statute of limitations analysis as they do on the statute of repose—that the claims did not accrue until the land subsided. As already discussed, the *Nida* accrual analysis applies to trespass claims and not to claims for negligence and nuisance, which run from the act of the Defendant. Here, it is uncontroverted that the Burdettes first noticed an unexplained hole in their driveway sometime before November 2000; that Stephanie Brown first noticed cracks and sloping and sinking ground before November 2005; that the Sidebottoms' basement collapsed in 2007; and that the Wests' basement collapsed in about 1986. These discoveries constitute substantial injuries, for which the Defendant's acts should have been reasonably ascertainable. These Plaintiffs' claims are therefore barred by the statute of limitations.

## C.    Negligence

---

[37]K.S.A. § 60-513(a).

[38]*Id.* § 60-513(b).

To prove their negligence claim under Kansas law,[39] Plaintiffs must show the existence of a duty, breach of that duty, injury, and a causal connection between the breach and the injury.[40]  Whether a party is negligent is normally a question of fact that is reserved for the jury.[41] Questions of breach and causation, however, may be a question of law in "rare cases where the evidence is susceptible to only one possible inference."[42]  To recover for "diminution in value of real property resulting from the marketplace fear or stigma alleged to have been created by a defendant's negligence, the plaintiff must establish that the property sustained a physical injury as a direct and proximate result of the negligent conduct."[43]  Defendant argues that summary judgment is appropriate on all negligence claims because Plaintiffs have come forward with no evidence that Defendant breached any duty of reasonable care in connection with maintaining the salt solution wells, or in creating the buffer zone.  Defendant further argues that there is no evidence of causation.

## 1.    Subsidence-related theories

Plaintiffs' first four negligence theories allege that Defendant negligently drilled, operated, or maintained the salt solution wells.  As already discussed, however, Defendant cannot be liable for actions or omissions that occurred before 2000, and it is undisputed that

---

[39]The parties agree that Kansas law, the substantive law of the forum state, applies in this diversity action. *See Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1302 (10th Cir. 2011).

[40]*Thomas v. Cnty. Comm'rs of Shawnee Cnty.*, 262 P.3d 336, 346 (Kan. 2011).

[41]*Petsinger v. Wheeler*, No. 10-2428-SAC, 2011 WL 2579830, at *2 (D. Kan. June 28, 2011) (citing *Cullip v. Domann*, 972 P.2d 776, 782 (1999)).

[42]*Carl v. City of Overland Park, Kan.*, 65 F.3d 866, 869, 872 (10th Cir. 1995) (citation omitted); *Hale v. Brown*, 197 P.3d 438, 441 (Kan. 2008).

[43]*Smith v. Kan. Gas Serv. Co.*, 169 P.3d 1052, 1062–63 (Kan. 2007).

Defendant acquired the land in 2002 and never drilled or operated any wells in the area. The Court agrees that any claims associated with activities that occurred before 2000 are barred. While this Defendant may be charged with maintaining the wells after it acquired the property in 2002, it is undisputed that Vigindustries did not drill or operate the wells. Therefore, summary judgment must be granted on the negligence theories associated with operating and drilling the wells.

To the extent Plaintiffs claim that Defendant negligently maintained the wells, the Defendant first argues that there is no evidence it breached a duty of reasonable care. First, Defendant argues that there is no evidence of the standard of care to be applied, which requires expert testimony. The Court need not decide whether expert testimony would be required in this matter to establish the standard of care associated with maintaining the wells, or to establish causation, because the only evidence relied upon by Plaintiffs is Dr. Mitchell's opinion on these issues.[44] The Court has already ruled that Dr. Mitchell's opinions are inadmissible. But even if Dr. Mitchell's opinion was admissible, it does not establish the standard of care associated with maintaining the wells, nor that this Defendant breached a duty of reasonable care.

Defendant also argues that there is no evidence adduced by Plaintiffs in support of the causation element on their negligence theories. Defendant points to Dr. Mitchell's opinion that the damage to Plaintiffs' property was caused by subsidence due to the geology of the Hutchinson area and the high density of salt solution wells on the wellfield. Because neither cause of subsidence can be attributable to Defendant, it maintains that there is no evidence of

---

[44]*See generally, Moore v. Assoc. Material & Supply Co.*, 948 P.2d 652 (Kan. 1997) (explaining the difference between lay and opinion testimony on causation in non-professional negligence cases). Plaintiffs other expert, Dr. Simons, expressed no opinions on the standard of care for drilling, operating, or maintaining salt solution wells, or on causation.

causation. Plaintiffs argue that there is a genuine issue of material fact about the cause of their property damage and therefore summary judgment must be denied.

To show causation, Plaintiffs must present evidence that would allow a reasonable jury to infer that "it is more likely than not that the conduct of defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."[45] Contrary to Plaintiffs' characterization of Defendant's motion on causation, Defendant does not argue that there is no genuine issue of material fact about whether subsidence caused Plaintiffs' damages. Instead, Defendant argues that there is no evidence that it caused the subsidence-related damages described by Dr. Mitchell in his report. Dr. Mitchell states that the area's geology, as well as salt removal, caused subsidence and a continued risk of future subsidence, leading to Plaintiffs' damages. But Dr. Mitchell does not opine that Defendant is responsible for the area's geology or for the salt removal. It is undisputed that Defendant never drilled or operated any brine wells on the wellfield or in the Careyville area. And there is no evidence that Defendant contributed to the geology of the Hutchinson area.

Plaintiffs again argue that they need not show that Defendant actually removed the salt from the ground to establish their negligence claim, citing *Nida*'s language that a landowner "has an absolute right to subjacent support unless that right has been distinctly waived."[46] But as already explained in the Court's discussion of the statute of repose, this language does not apply

---

[45]*Young v. Deibert*, 147 P.3d 1065, 1072–73 (Kan. 2006).

[46]*Nida*, 855 P.2d at 82–83 (quoting *Audo v. Mining Co.*, 162 P. 344, 344 (Kan. 1917)).

in the context of a negligence or nuisance action; a cause of action based on inadequate subjacent support is in the nature of trespass. Summary judgment has already been granted on that claim.

Accordingly, even if the Court had found Dr. Mitchell's expert testimony admissible, the Court would grant summary judgment on the breach and causation elements of Plaintiffs' negligence claims associated with subsidence. Assuming as true Dr. Mitchell's opinion that Plaintiffs' subsidence-related damages are caused by geology and salt removal, there is no evidence that these causes are attributable to Defendant. Because Defendant points to a lack of evidence of causation in fact on those negligence theories and because Plaintiffs fail to come forward with such evidence, summary judgment is granted.

### 2.     Buffer Zone

Plaintiffs' last negligence theory is that Defendant was negligent in creating the buffer zone because it did not identify and purchase all homes at risk of future subsidence. This negligence claim relies on Dr. Mitchell's opinion, which this Court has excluded. Plaintiffs point to no other evidence that would create a genuine issue of material fact about whether Defendant exercised reasonable care when it investigated the brine wells and caverns on the wellfield, and as a result of that investigation, and in agreement with the KDHE and the City of Hutchinson, decided to make offers to buy certain residential properties located on the northern and eastern edges of the Careyville neighborhood in order to increase the buffer between the former brine wells on the wellfield and the residential properties in Careyville. Defendant submits evidence that it retained an engineering firm to investigate and that it determined the buffer zone by measuring a certain radius from the edge of the wells. Dr. Mitchell admitted in his report, even if the Court considers it, that there is no scientific method to construct a safe

buffer zone within Careyville.

Further, even if Plaintiffs could establish that Defendant failed to act with reasonable care, there is an absence of evidence that the buffer zone caused physical damage to Plaintiffs' properties sufficient to recover damages for the diminution in value of real property resulting from the marketplace fear or stigma.[47] To be sure, some Plaintiffs testified about physical damage to their property, but it all predated the conclusion in April 2010 of Defendant's buyout of buffer zone properties.

Plaintiffs argue that the Kansas Supreme Court's decision in *Smith v. Kansas Gas Service*, which holds that plaintiffs in negligence actions must show physical damage to the property in order to obtain damages for marketplace fear or stigma, is distinguishable from the facts of this case.[48] *Smith* involved class claims of negligence and nuisance by landowners who claimed that their property values were diminished by natural gas explosions resulting from gas leaks that had been caused by negligent maintenance and operation of a nearby natural gas storage facility.[49] Since those plaintiffs suffered no physical injury, the Court held that they could not recover stigma damages. Plaintiffs here argue that their subsidence-related damages and the risk to their properties of future physical damage from subsidence distinguish them from the plaintiffs in *Smith*. The Court agrees with Defendant that this argument conflates Plaintiffs' various theories of negligence. While Plaintiffs' property damage may be sufficient to allow for stigma damages on the subsidence-related theories of negligence, they must make a different

---

[47] *See Smith*, 169 P.3d at 1062–63.

[48] *Id.*

[49] *Id.* at 1054–55.

showing on their buffer zone theory: that Defendant's failure to include Plaintiffs in the buffer zone caused their properties physical damage. Plaintiffs make no such showing. Accordingly, summary judgment is appropriate as to Plaintiffs' prayer for stigma damages on the buffer zone theory of negligence.

**D.      Nuisance**

In order to prove their nuisance claim under Kansas law, Plaintiffs will have to show that: (1) Defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.[50] Kansas courts have been careful to explain that nuisance is not a type of tortious conduct in itself; it is a field of tort liability:

> Nuisance has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion. Professor Prosser concludes that the attempt frequently made to distinguish between nuisance and negligence, for example, is based entirely upon a mistaken emphasis based upon what the defendant has done rather than the result which has followed, and forgets completely the well-established fact that negligence is merely one type of conduct which may give rise to a nuisance. In other words a nuisance may result from conduct which is intentional or negligent or conduct which falls within the principle of strict liability without fault. The point is that nuisance is a result and negligence is a cause and they

---

[50]*Pagel v. Burlington N. Santa Fe Ry. Co.*, 316 F. Supp. 2d 984, 989 (D. Kan. 2004).

cannot be distinguished otherwise.[51]

There can be three sources of nuisance liability: "(1) an intentional invasion of the plaintiff's interests, or (2) a negligent one, or (3) conduct which is abnormal and out of place in its surroundings, and so falls fairly within the principle of strict liability.  With very rare exceptions, there is no liability unless the case can be fitted into one of these familiar categories."[52] Plaintiffs' intentional tort and strict liability claims were dismissed earlier in this case.  And the Court has granted summary judgment on Plaintiffs' negligence claim, finding no genuine issue of material fact as to whether this Defendant breached a duty of care, or caused Plaintiffs' injuries.  Because the nuisance claim is derived from the negligence claim, summary judgment must be granted on the nuisance claim, as well.

In sum, the Court finds that summary judgment should be granted on the claims asserted by Plaintiffs Kenneth Burdette, Linda Burdette, Danny Sidebottom, Sharon Sidebottom, Glen West, James West, and Stephanie Brown because they are barred by either the statute of repose or the statute of limitations.  Summary judgment is granted on the remaining negligence claims because Defendant fulfilled its summary judgment burden of identifying an absence of evidence on breach of the duty of reasonable care, and on causation, and Plaintiffs failed to come forward with admissible evidence to create a genuine issue of material fact.  Because the negligence claims fail, summary judgment must be granted on the nuisance claims, as they are premised on Defendant's negligent conduct in drilling, operating and maintaining the wells, and creating a buffer zone after the 2005 sinkhole.  For all of these reasons, Defendant's motion for summary

[51]*Culwell v. Abbott Const. Co., Inc.*, 506 P.2d 1191, 1196 (Kan. 1973); *see also Sandifer Motors, Inc. v. City of Roeland Park*, 628 P.2d 239, 245 (Kan. Ct. App. 1981) (citation omitted).

[52]*Sandifer Motors, Inc.*, 628 P.2d at  246 (citation omitted).

judgment is granted.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to

Exclude Expert Opinions of Dr. David L. Mitchell (Doc. 185) is **granted**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc.

187) is **granted**.  The Clerk shall enter judgment in favor of Defendant on all claims, plus costs.

Dated: March 17, 2014

           S/ Julie A. Robinson

           JULIE A. ROBINSON

           UNITED STATES DISTRICT JUDGE